**SHEET METAL WORKERS NATIONAL PENSION FUND et al., Appellees,**

v.

**BRYDEN HOUSE LIMITED PARTNERSHIP et al., Appellants.**

[Cite as *Sheet Metal Workers Natl. Pension Fund v. Bryden House Ltd. Partnership* (1998), 130 Ohio App.3d 132.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 97APE11–1513.

Decided Sept. 29, 1998.

134

*Leonard S. Sigall* and *Steven D. Stone,* for appellees Sheet Metal Workers National Pension Fund et al.

*Carlile, Patchen & Murphy, Laurence E. Sturtz* and *David M. Karr,* for appellants.

PETREE, Judge.

This action arises out of the claims of plaintiffs, Sheet Metal Workers National Pension Fund ("Sheet Metal"), a jointly trusted employee benefit plan, Arthur Moore, Matthew Hernandez, Jr., Alan J. Chernak, Clinton O. Gowan, Jr., Ronald Palmerick, and Bruce Stockwell, trustees of Sheet Metal ("trustees"), against defendants, Bryden House Limited Partnership ("Bryden House"), Bryden House Corporation, Building Trades Minority Development Partnership, Inc., and Building Trades Minority Development Corporation, general partners of Bryden House, to recover guaranty fees allegedly owed plaintiffs under the terms of a guaranty fee agreement ("fee agreement") executed by the parties in May 1993.

On May 5, 1993, defendants entered into a "Development and Construction Loan Agreement" ("loan agreement") with Provident Bank ("Provident") wherein Provident agreed to lend defendants $6.9 million for the renovation of the former St. Ann's Hospital located at 1555 Bryden Road, Columbus, Ohio. The proceeds of the Provident loan were to be used for the construction of a low income, elderly housing project with attendant commercial/retail space. The project qualified for extensive tax credits.

Plaintiffs agreed to guaranty the loan. In consideration for plaintiffs' guaranty, defendants agreed to pay a monitoring fee of $3,000 per month and an initial

credit enhancement fee of $28,750 per month "for the period beginning May 5, 1993 and ending at the earlier of (a) the date * * * [Sheet Metal] no longer has liability to The Provident Bank for the repayment of the Loan pursuant to the Guaranty; and (b) the date The Provident Bank loan is paid in full." These terms were embodied in a written fee agreement executed by the parties in May 1993.

In accordance with the May 1993 fee agreement, plaintiffs executed and delivered to Provident an unconditional guaranty of the $6.9 million loan. Plaintiffs maintained the guaranty until November 1994, when permanent financing was obtained for the project. Defendants paid the monthly monitoring and initial credit enhancement fees until January 1994, at which time defendants refused to make any further payments.

On February 8, 1996, plaintiffs filed an action against defendants to recover the monthly monitoring and initial credit enhancement fees allegedly owed from January through October 1994 under the terms of the fee agreement executed in May 1993.

After a trial to the bench, the court, by judgment entry dated October 16, 1997, awarded judgment to plaintiffs in the amount of $317,500 ($31,750 per month in monitoring fees and initial credit enhancement fees for ten months [January through October 1994]), together with prejudgment interest in the amount of $104,387.33 through September 30, 1997, for a total judgment of $421,887.33, continuing with prejudgment interest in the amount of $86.99 per diem and postjudgment interest at ten percent per annum. Defendants have timely appealed the trial court's judgment, advancing the following three assignments of error:

"[I]. The trial court erred by excluding under the parol evidence rule appellants' testimonial and documentary evidence of the loan agreement, signed by all parties at the loan closing, which directly conflicted with the terms of the fee agreement.

"[II]. The trial court erred by excluding under the parol evidence rule appellants' testimonial and documentary evidence of a post-closing novation or modification of the fee agreement.

"[III]. The trial court abused its discretion and ruled against the manifest weight of the evidence by finding that the appellants did not sign the fee agreement under economic duress."

By the first assignment of error, defendants contend that the trial court erred by excluding, under the parol evidence rule, extrinsic documentary and testimonial evidence that, according to defendants, conclusively demonstrated that the fee

agreement did not reflect the actual agreement between the parties regarding the amount of guaranty fees owed by defendants.

According to this evidence, on January 22, 1992, Edward I. Williams, acting on behalf of plaintiffs, sent a "Letter of Intent" to defendants setting forth plaintiffs' intentions regarding their proposed guaranty of the construction loan agreement between defendants and Provident. The terms of the "Letter of Intent" required payment by defendants of a monthly monitoring fee as well as a monthly credit enhancement fee out of the proceeds of the construction loan until the Provident loan was paid off and plaintiffs' guaranty was released by Provident. The "Letter of Intent" was signed by both parties, although it contained language indicating that the letter "is not intended to be binding on the parties."

In December 1992, Ed Carlough, President of Sheet Metal, orally committed to guaranty the Provident loan as of January 2, 1993. Construction on the project was commenced in January 1993 based on Carlough's oral commitment. In order for the project to qualify for the tax credits, the project had to be completed by December 1993. Carlough's approval was later confirmed in writing by letter dated March 9, 1993.

According to testimony offered by Robert Schilling, President of Bryden House Corporation, and Nicholas Montell, a general partner of Bryden House, plaintiffs and defendants agreed from the inception of the project that the guaranty fees were to come out of the construction loan proceeds and were to be paid from the date of closing through December 1993. Defendants also offered into evidence a construction schedule prepared by defendants' accountants, dated May 3, 1993, that contained a line item entitled "SMW National Pension Fund Fees," which, according to defendants, capped the guaranty fees owed to plaintiffs at $348,717.

At the closing on May 5, 1993, defendants entered into the loan agreement, which memorialized both Provident's agreement to loan defendants $6.9 million for the construction of the project and plaintiffs' agreement to guaranty the loan. The loan agreement was signed by all pertinent parties. Included as part of the loan agreement was Exhibit D, a "Construction Disbursement Budget," which listed aggregate construction period guarantor fees as $348,717.

In addition to the loan agreement, closing documentation included the fee agreement, which, as previously noted, obligated defendants to pay monthly guaranty fees totaling $31,750 from the date of closing until the Provident loan was paid off and plaintiffs were released from the guaranty. Although the fee agreement referred to the loan agreement, the fee agreement did not contain language limiting fees to be paid from construction loan proceeds, nor did it contain language capping fees at $348,717.

Schilling testified that during the closing, he expressed his concern to Williams that the fee agreement was inconsistent with the loan agreement. Both he and Montell admitted at trial that they understood the terms of the fee agreement to mean that defendants would be obligated to pay plaintiffs $31,750 per month until the Provident loan was paid off at the end of October 1994 or until plaintiffs no longer had liability to Provident for repayment of the loan. Schilling asked Williams to change the fee agreement to comport with the loan agreement, which limited the fees to be paid out of the construction loan proceeds and capped fees at $348,717. Both Schilling and Montell testified that Williams indicated that he was not authorized to make such a material change to the fee agreement without the approval of Carlough. He also stated that it would take weeks to get the fee agreement corrected. Williams told Schilling and Montell that defendants would just have to "trust him" that defendants would not be obligated for any fees over those set forth in the loan agreement. According to Schilling, based on Williams's assurances, defendants signed the fee agreement. Defendants did not make a formal written request that the fee agreement be changed to comport with the loan agreement.

The testimony of Montell and Schilling regarding the discussions held between them and Williams at the May 5, 1993 closing was generally corroborated by Steve Mershon, the attorney who represented defendants at the closing. Mershon testified that Schilling told him that he was unwilling to sign a fee agreement that did not contain the previously agreed-upon cap of fees. Mershon told Williams that defendants were unwilling to sign the fee agreement if fee payments were required beyond what was expressed in the loan agreement. Williams told Mershon that he wanted to discuss the proposed change in the fee agreement with Carlough and the trustees before signing any change to the agreement. According to Mershon, Williams orally agreed that defendants would not be obligated to pay any more fees than those stated in the loan agreement, that plaintiffs were committed to the project, and that Mershon would just have to "trust him."

Mershon relayed this information to defendants and told them to sign the fee agreement only if they were willing to trust Williams. Based on Mershon's advice and Williams's assurances, Schilling signed the fee agreement on behalf of defendants even though defendants were aware that the fee agreement was inconsistent with the loan agreement. The fee agreement was not signed by Carlough until May 23, 1993. The parties did not discuss changing the fee agreement during the interim period between May 5 and May 23, 1993.

The trial court heard the above-noted testimony and examined the evidence submitted by defendants, but ultimately excluded the evidence under the parol evidence rule. The trial court determined that the fee agreement constituted a

clear and unambiguous statement of defendants' obligation to plaintiffs and could not be altered based upon any prior or contemporaneous oral or written communications between the parties. For the reasons that follow, we agree.

The parol evidence rule precludes the introduction of evidence of alleged prior or contemporaneous agreements which attempt to vary or contradict the terms of a written agreement. *AmeriTrust Co. v. Murray* (1984), 20 Ohio App.3d 333, 335, 20 OBR 436, 438–439, 486 N.E.2d 180, 183–184. "The rule is applied, in cases where a written contract appears to incorporate all relevant terms of the agreement, to bar the introduction of other matters discussed (either in writings or orally) by the parties *prior* to, or contemporaneous with, the execution of the final agreement. The rule thus gives effect to the intention of the parties that is evident on the face of the original contract." (Emphasis *sic.*) *Am. Gen. Finance v. Beemer* (1991), 73 Ohio App.3d 684, 687, 598 N.E.2d 144, 146.

"Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions." *Shifrin v. Forest City Ent., Inc.* (1992), 64 Ohio St.3d 635, 597 N.E.2d 499, syllabus. When the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties. *Id.* at 638, 597 N.E.2d at 501–502.

In determining whether the terms of a contract are ambiguous, the following test is employed: "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id.,* citing *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 246, 7 O.O.3d 403, 406, 374 N.E.2d 146, 150. If no ambiguity appears on the face of the instrument, parol evidence may not be considered in an effort to demonstrate an ambiguity. *Id.*

Defendants argue that because Ohio law allows extrinsic evidence to explain inconsistencies and ambiguities within a contract, the parol evidence offered by defendants should have been admitted by the trial court to explain the inconsistencies between the loan agreement and the fee agreement. However, the fee agreement and the loan agreement are two entirely separate documents. The fee agreement, standing alone, is a fully integrated, clear and unambiguous, signed final written agreement. As noted previously, both Schilling and Montell admitted that the fee agreement was clear and unambiguous on its face and obligated defendants to pay plaintiffs $31,750 per month until the Provident loan was paid off at the end of October 1994 or until plaintiffs no longer had liability to

Provident for repayment of the loan. Defendants have never claimed that the terms of the fee agreement were unclear or ambiguous. Defendants' arguments that their parol evidence, rather than the fee agreement, expressed the parties' intentions regarding defendants' obligations with respect to the guaranty fees is an attempt to have this court rewrite the fee agreement. The *Shifrin* court has determined that the rewriting of clear and unambiguous contracts is expressly prohibited.

This case presents a guaranty fee dispute between highly sophisticated parties, all of whom were represented by counsel at the closing on May 5, 1993. Whether, as defendants argue, they signed the fee agreement only because they "trusted" Williams when he said that he would discuss the matter with the trustees and that defendants would never be obligated for fees above those set forth in the loan agreement does not materially alter the fact that defendants signed the agreement, which clearly and unambiguously stated that defendants were obligated to pay guaranty fees from the date of closing until plaintiffs either no longer had liability to Provident for repayment of the loan or the loan was paid in full.

We find that the language in the fee agreement is clear and unambiguous and that extrinsic evidence could not be considered. The alleged representations would not aid the court in clarifying the terms of the fee agreement but would contradict the terms of the agreement the parties reached. *Yaroma v. Griffiths* (1995), 104 Ohio App.3d 545, 555, 662 N.E.2d 867, 873–874.

For the foregoing reasons, we hold that the trial court did not err in finding that defendants' parol evidence was not admissible to alter or vary the terms of the fully integrated, clear and unambiguous, written fee agreement. Accordingly, the first assignment of error is overruled.

By the second assignment of error, defendants contend that the trial court erred by excluding, under the parol evidence rule, defendants' evidence of draw disbursements that were verified and signed by plaintiffs' representatives in the eight months following the closing on May 3, 1993. Defendants argue that this evidence conclusively established a postclosing novation of the fee agreement.

Preliminarily, we note that this court has held that novation is an affirmative defense. *Braverman v. Spriggs* (June 26, 1979), Franklin App. No. 78AP–681, unreported; *The Continent JV326128 v. Metsker* (Sept. 22, 1988), Franklin App. No. 88AP–388, unreported, 1988 WL 99341. The Supreme Court of Ohio recently held that affirmative defenses other than those listed in Civ.R. 12(B) are waived if not raised in either a responsive pleading or by amendment. *Jim's Steak House, Inc. v. Cleveland* (1998), 81 Ohio St.3d 18, 20, 688 N.E.2d 506, 508, modifying *Hoover v. Sumlin* (1984), 12 Ohio St.3d 1, 4, 12 OBR 1, 3–4, 465

N.E.2d 377, 379–380. Our review of the record reveals that defendants failed to raise the affirmative defense of novation in a responsive pleading or by amendment. As a result, the defense was not before the court and is, therefore, waived. *Fowler v. Coleman* (Mar. 10, 1998), Franklin App. No. 97APE09–1156, unreported, 1998 WL 107358.

Having found that defendants waived the affirmative defense of novation by failing to raise it in a responsive pleading or by amendment, we overrule the second assignment of error.

By the third assignment of error, defendants contend that the trial court's finding that defendants did not sign the fee agreement under economic duress was against the manifest weight of the evidence.

"Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. In deciding whether the judgment is against the manifest weight of the evidence, a reviewing court must "be guided by a presumption that the findings of the trier-of-fact were indeed correct." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276. Giving such deference to the findings of the trial court is merited since the trial court is in the best position to view the witnesses, observe their demeanor, and assess their credibility. *Id.* at 80, 10 OBR at 410–411, 461 N.E.2d at 1276–1277.

As recognized by the Supreme Court of Ohio in *Blodgett v. Blodgett* (1990), 49 Ohio St.3d 243, 551 N.E.2d 1249, the law of duress as a cause to avoid a contract has evolved to encompass both physical and economic compulsion. *Id.* at 246, 551 N.E.2d at 1251–1252, citing 1 Restatement of the Law 2d, Contracts (1981), Section 176, Comment *a.* The *Blodgett* court set forth the elements necessary to establish duress:

"To avoid a contract on the basis of duress, a party must prove coercion by the other party to the contract. It is not enough to show that one assented merely because of difficult circumstances that are not the fault of the other party." *Id.* at syllabus.

Further, in order to establish economic duress, the party must show that it was subjected to a wrongful or unlawful act or threat that deprived the party of its unfettered will. *Id.* at 246, 551 N.E.2d at 1251–1252, citing 13 Williston on Contracts (3 Ed.1979) 704, Section 1617.

The *Blodgett* court also set forth the following general factors necessary to establish a cause of action for duress: (1) one party involuntarily accepted terms imposed by the other; (2) the party seeking to establish duress was operating

under circumstances permitting no other alternative but to comply; and (3) the circumstances were the result of the coercive acts of the other party to the agreement. *Id.*

In the present case, we conclude that defendants have failed in their burden to prove duress. Defendants argue that they were induced by the actions of plaintiffs into signing the fee agreement under the "false pretenses and assurances that the loan agreement controlled and that [plaintiffs] would not seek additional monies." While plaintiffs may have been aware that defendants were under considerable time pressure to complete the project by December 1993 in order to obtain the tax credits, plaintiffs committed no affirmative act so as to unlawfully restrict defendants' freedom of choice in deciding whether to sign the agreement in reliance on Williams's assurances.

Furthermore, defendants did not involuntarily accept the terms of the fee agreement as the result of coercive acts of plaintiffs, nor was signing the fee agreement the only alternative under the circumstances. As noted previously in this case, we have sophisticated parties and their attorneys dealing on an equal footing. According to testimony offered by Schilling, Montell and Mershon, Williams told defendants at the closing that defendants would just have to "trust him" that they would not be obligated to pay any more fees than those stated in the loan agreement. Defendants' attorney told his clients to sign the fee agreement only if they were willing to trust Williams. Based on this advice and Williams's oral assurances, defendants voluntarily signed the fee agreement even though they were fully aware that the agreement obligated them to pay over $300,000 in guaranty fees during 1994.

Besides the fact that it is completely unreasonable for experienced, sophisticated business persons such as defendants to rely on oral assurances made by the other party to a contract, it is clear that it was not imperative that the fee agreement must have been signed at the closing. Carlough did not sign the agreement until May 23, 1993. Further, the record contains no evidence that the defendants made any attempt during the interim period between May 5 and May 23, 1993 to discuss with plaintiffs the possibility of modifying the fee agreement to reflect the representations made by Williams at the closing.

Having found competent, credible evidence to support the trial court's decision that the fee agreement was not signed under economic duress, we overrule the third assignment of error.

As this court has overruled each of defendants' assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK, J., and DESHLER, P.J., concur.